[No. 45512-9-II.   Division Two.   July 14, 2015.]

*In the Matter of the Detention of* Michael Sease.

*Gregory C. Link* (of *Washington Appellate Project*), for appellant.

*Robert W. Ferguson*, *Attorney General*, and *Sarah Sappington*, *Assistant*, for respondent.

¶1  LEE, J. — Michael Sease was civilly committed under the Sexually Violent Predator (SVP) Act, chapter 71.09 RCW, in 2007. At his show cause hearing in 2013, the trial court concluded that the State had presented prima facie evidence showing Sease still met the definition of an SVP.

The trial court further concluded that Sease had not established probable cause to believe his condition had so changed that he no longer met the definition of an SVP. Based on the plain language of RCW 71.09.090, and the recent opinion from our Supreme Court *In re Personal Restraint of Meirhofer*, 182 Wn.2d 632, 343 P.3d 731 (2015), we hold that the State established a prima facie case showing that Sease still met the definition of an SVP, and that Sease failed to present probable cause to believe his mental condition had "so changed" that he no longer met the definition of an SVP. Accordingly, we affirm.

## FACTS

1. BACKGROUND

¶2 Before the offenses for which Michael Sease was civilly committed in 2007, he had several run-ins with law enforcement and mental health professionals. Prior to dropping out of school in the 9th or 10th grade, Sease's records indicated he was enrolled in special education classes, although Sease denies this. No verified juvenile record exists for Sease, but he reports he was caught stealing beer at the age of 15.

¶3 In 1980, when Sease was 19 or 20 years old, he physically and sexually assaulted a 31-year-old woman. In 1981, Sease was convicted of shoplifting. In 1982, Sease was charged with driving while intoxicated, obstructing a public servant, and a liquor violation. When Sease was about 25 years old, he was admitted to Western State Hospital after being found preparing to jump off a bridge. At that time, Sease was diagnosed with adjustment disorder with mixed emotions and dependent personality traits. In 1986, Sease was charged with simple assault and hit and run, for which he failed to appear. In 1987, Sease was arrested for driving while license suspended, simple assault, no valid operator's license and failures to appear on previous charges. The same year, he kidnapped and attempted to rape a 15-year-

old girl and, less than a month later, raped a 19-year-old woman.

¶4 For the 1987 offenses, Sease was convicted of first degree kidnapping and first degree rape. *In re Det. of Sease*, 149 Wn. App. 66, 70, 201 P.3d 1078, *review denied*, 166 Wn.2d 1029 (2009). Sease was incarcerated for about 16 years. During his incarceration for these offenses, he received about 250 infractions, 200 of which were major infractions. Clinicians at the Department of Corrections believed his problems in prison were due to a personality disorder.

¶5 In 1990, following a series of self-mutilation incidents, Sease was evaluated by Dr. Thomas Foley. Sease denied committing any sexual offenses and said his self-mutilation was an expression of his anger for being unjustly imprisoned. Dr. Foley made the following diagnosis:

Axis I    Deferred
Axis II    Antisocial Personality Disorder
           Borderline Personality Disorder

Clerk's Papers (CP) at 269.

¶6 In 1994, Sease was evaluated by Dr. Edward Goldenberg. Dr. Goldenberg made the following diagnosis:

Axis I    Paraphilia, Not Otherwise Specified
           Alcohol Abuse
Axis II    Borderline Personality Disorder
           Antisocial Personality Disorder
           Mild Mental Retardation

CP at 269.

¶7 In 1996, Sease was evaluated by Dr. Barry Grosskopf. At that time, Dr. Grosskopf noted it was Sease's "sixth psychiatric hospitalization . . . . He has previously attempted suicide or mutilated himself over 60 times." CP at 269. Dr. Grosskopf made the following diagnosis:

Axis I    Alcohol Dependence

Axis II  Borderline Personality Disorder with Antisocial Features

CP at 269.

¶8 In 2002, Sease was evaluated by Dr. Savio Chan. When Dr. Chan asked Sease about the discrepancies between the contents of his file and his self-reporting, Sease responded, "My life is my business." CP at 270. Dr. Chan further noted, "It is obvious that truth to him is whatever [is] convenient or advantageous to him," and Sease showed "no remorse and no concern for his victims." CP at 270.

¶9 In 2004, Sease was evaluated by Dr. Keri Clark. Dr. Clark concluded that Sease's personality is "marked by a complex mixture of narcissistic, antisocial, and borderline features." CP at 270. Dr. Clark noted the "primary areas of concern are the extreme sense of entitlement, acute sensitivity to perceived slights, lack of empathy, and fear that he will be abandoned or ignored." Dr. Clark made the following diagnosis:

Axis I:   No Diagnosis

Axis II:  Personality Disorder, Not otherwise Specified, with Narcissistic, Antisocial, and Borderline Features

CP at 271.

¶10 Sease was scheduled to be released in 2005, but the State successfully petitioned the court to commit him as a sexually violent predator, and this court affirmed his commitment. *Sease*, 149 Wn. App. at 70. Dr. Dennis Doren completed Sease's initial evaluation for civil commitment in 2005. At that time, Dr. Doren identified Sease as suffering from the following conditions:

Axis I    Alcohol Dependence, with physiological dependence, in a controlled environment

Axis II   Borderline Personality Disorder

          Narcissistic Personality Disorder

Antisocial Personality Disorder

CP at 27.

¶11 At the civil commitment trial, Dr. Doren testified that " '[f]or each [personality disorder], what we look at is the pattern of behavior.' " *Sease*, 149 Wn. App. at 71 (first alteration in original). Dr. Doren also testified:

> [A]ntisocial personality disorder involves a pattern of "disregard for and violation of the rights of others." A person with a borderline personality disorder has a pattern of instability in any of four areas: emotions, thinking, interaction with other people, or ability to control impulses. The pattern for narcissistic personality disorder is "that they have disdain for everybody else. Nobody is as good as they are. They are above. They should be treated specially. . . . Other people are, basically, worthless."

*Sease*, 149 Wn. App. at 71 n.6 (second alteration in original) (citation omitted). Dr. Doren further testified:

> "[E]ach of [Sease's] personality disorders caused him serious difficulty in controlling his behavior" and that the antisocial personality disorder and borderline personality disorder "predispose him to commit criminal sexual acts and make him likely to commit a criminal sexual act in the future if not confined." [Dr. Doren] noted that not all people with these disorders manifest sexually violent behavior but that Sease did. [Dr. Doren] characterized Sease's narcissistic personality disorder and his alcohol dependency diagnosis as "other risk considerations" for reoffense.

*Sease*, 149 Wn. App. at 71-72 (second alteration in original) (citation and footnote omitted).

¶12 Pursuant to RCW 71.09.070, Sease's detention is reviewed annually. Dr. Robert Saari conducted Sease's first annual review. At that time, Dr. Saari identified Sease as suffering from the following conditions:

Axis I    Rule Out[1] — Paraphilia, Not Otherwise Specified, Nonconsent Alcohol Dependence

Axis II    Narcissistic Personality Disorder with Borderline and Antisocial Traits

Rule Out Borderline Intellectual Functioning

Rule Out Cognitive Disorder, Not Otherwise Specified

Rule Out Dementia Due to Head Trauma

CP at 63. The report stated that "Sease would meet the full criteria for Antisocial Personality Disorder if he more clearly had symptoms of Conduct Disorder prior to the age of 15 years." CP at 62 n.13. Dr. Saari's report included the following graphic to explain the symptoms of the three pertinent personality disorders:

Narcissistic Personality Disorder – a) grandiose sense of self-importance, b) strong sense of entitlement, c) interpersonally exploitative and manipulative, d) lack of empathy, e) arrogant, haughty behaviors.

Antisocial Personality Disorder – a) failure to conform to social norms with respect to lawful behaviors, b) some degree of deceitfulness, c) impulsivity, d) irritability and aggressiveness, e) lack of remorse.

---

[1] A "rule-out" diagnosis means the doctor did not have sufficient evidence at the time to make a certain diagnosis. As our Supreme Court noted,

"The phrase 'rule out' does not appear in DSM-IV [American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994)] and is not part of the vocabulary of DSM. However, it is a common expression in psychiatric diagnosis and is often seen in reports, especially from professionals with medical training or experience in medical settings. There is often some confusion among nonphysicians as to the meaning of this expression. 'Rule out' is typically used to identify an alternative diagnosis that is being actively considered, but for which sufficient data has not yet been obtained. For instance, the diagnostic statement 'Alcohol Abuse, rule out Alcohol Dependence,' suggests that the examiner has definitely concluded there is a drinking problem; that there is definitely evidence supporting Alcohol Abuse; and that the more serious problem of Alcohol Dependence may be present, but the available evidence is inconclusive. 'Rule out' can be thought of as a reminder or instruction to continue seeking the information which would allow a diagnosis to be conclusively identified or eliminated from consideration (for the present)."

*Meirhofer*, 182 Wn.2d at 640 n.3 (quoting ALVIN E. HOUSE, DSM-IV DIAGNOSIS IN THE SCHOOLS 33 (2002), http://books.google.com/books?id=MtS2LjuU5AIC&q=33#v=snippet&q-33&f=false).

Borderline Personality Disorder – a) some degree of abandon-ment sensitivity and abandonment fears, b) recurrent suicidal behavior, gestures, threats, and self-mutilating behavior[ ], c) affective instability, d) inappropriate, intense anger.

CP at 62. Dr. Saari said that in his opinion, "Sease's narcissistic personality disorder is the primary mental disorder that places him at risk for future sexual violence." CP at 61.

2. CURRENT REVIEW

a. Dr. Newring's 2013 Annual Review

¶13  In his September 2013 evaluation, Dr. Kirk Newring diagnosed Sease with the following:

Axis I:  Alcohol Dependence, In a Controlled Environment
Cognitive Disorder, Not Otherwise Specified
Rule Out — Paraphilia, Not Otherwise Specified, Nonconsent

Axis II:  Narcissistic Personality Disorder with Borderline, Antisocial, Sadistic, and Paranoid Features
Borderline Intellectual Functioning

CP at 256. Dr. Newring prefaced the diagnoses with:

Mr. Sease does not appear to have had a meaningful and durable change in his behavior and disposition during the current review period. While he sees himself as having made some incremental gains in empathy and peer relations, Mr. Sease's diagnostic constellation from the previous year appears consistent with his current behavior and functioning.

CP at 256. Dr. Newring also stated that Sease had "made some progress in his treatment as a sex offender although major barriers remain evident." CP at 262.

¶14  Describing Sease's rule-out diagnosis of paraphilia, Dr. Newring said there is not enough available information "to conclude that he meets criteria for a paraphilia [sic] despite elements of planning, victimizing strangers, and using physical force and threats with respect to two of his

victims." CP at 256. The insufficiency of the information is attributable, in part, to Sease's "refusal to openly discuss significant aspects of his sexual behavior." CP at 257.

¶15 Describing Sease's narcissistic personality disorder with borderline, antisocial, sadistic, and paranoid features, Dr. Newring states, "There is little doubt that Mr. Sease presents with a significant overall pattern of personality dysfunction that has severely impacted his ability to function without substantial difficulties both in the community and within institutional settings." CP at 257.

¶16 Dr. Newring also addressed the discrepancies in the reviewing doctors' diagnoses over the years. He noted that when Dr. Doren conducted his commitment evaluation in 2005, Dr. Doren "contended that Mr. Sease's Borderline Personality and Antisocial Personality, though not his Narcissistic Personality, predisposed him to commit sexual violent acts since they represent serious difficulty in controlling his behavior." CP at 257. He also noted Dr. Saari's report for the 2008-09 review, where Dr. Saari "asserted that Mr. Sease's overall pattern of personality dysfunction was essentially narcissistic although he had prominent borderline and antisocial features." CP at 257.

¶17 Dr. Newring conducted an actuarial risk assessment using the Static-99R scoring system. On the Static-99R, Sease scored in the "nominal moderately high risk category (score of 5) for being charged or convicted with another sexual offense." CP at 257. Dr. Newring wrote:

> Compared to all other adult sex offenders[,] Mr. Sease's score falls into the 81.4 to 89.7 percentile. This means that 81.4 to 89.7 percent of sex offenders score at[,] or below[,] Mr. Sease's scores. . . . His relative risk ratio is 2.23 times higher than the average sexual offender. When compared to sex offenders classified as Pre-Selected High Risk/Need, Mr. Sease obtained a score of 19.6% . . . for reoffending within 5 years[,] and 27.7% . . . for reoffending within 10 years.

CP at 257-58. About the Static-99R, Dr. Newring cautioned that it "should be considered with other sources of clinical

information," and "may under-represent true prevalence rates." CP at 258.

¶18 In addition to the actuarial risk assessment, a dynamic risk assessment was conducted. Dr. Newring found that Sease had "not shown a durable change in dynamic risk over the current review period." CP at 258. Dr. Newring stated that risk factors were particularly difficult to conduct with Sease, "because he has been so resistant to self-disclosure and related treatment." CP at 258. Consequently, the risk factors Dr. Newring listed were derived from Sease's interactions with his peers and the staff of the Special Commitment Center (SCC). Dr. Newring concluded his review stating:

> [Sease's] civil commitment, according to [RCW] 71.09.060, is to continue under the care of the Department of Social and Health Services to ensure care, control and treatment until his condition has changed such that he no longer meets the definition of sexually violent predator or conditional release to a less restrictive alternative . . . is determined to be in Mr. Sease'[s] best interest and conditions can be imposed that would adequately protect the community.

> Mr. Sease also continues to present with a mental condition(s) [sic] that seriously impairs his ability to control his sexually violent behavior. Secondly, it is my opinion that Mr. Sease's condition has not so changed such that conditions can be imposed that would adequately protect the community, and a less restrictive alternative would not, at the present time, be in his best interest.

CP at 262-63.

b. Dr. Abbott's Report

¶19 Dr. Brian Abbott was retained by Sease to evaluate whether Sease's conditions had "so changed . . . that he can be released unconditionally" under RCW 71.09.090(1)(a). CP at 290. In his report, Dr. Abbott reviewed Sease's file, including the original commitment evaluation by Dr. Doren, and the subsequent annual reviews. Dr. Abbott

opined that "Sease no longer suffers from the mental disorder or abnormality that was the basis for his 2007 civil confinement," and that this "change in his mental disorder or abnormality appears to result from his positive responses to continuing participation in treatment at SCC since his . . . commitment date." CP at 290.

¶20  Dr. Abbott notes the numerous issues Sease has had with treatment, including his refusal to participate in some treatments, his sporadic participation in others, and his expulsion from at least two treatment programs. Yet, Dr. Abbott concludes, Sease has "continuously participated in the therapeutic milieu at SCC, which consists of behavior modification treatment, social and vocational skill development, and the sexual offender treatment program." CP at 308. Dr. Abbott described Sease's behavior modification treatment:

> Mr. Sease has been rewarded for prosocial behavior, has received consequences for antisocial, narcissistic, and borderline behaviors, and he has not had these personality traits positively reinforced. Mr. Sease has learned he receives rewards by complying with rules and regulations as he earns increased privileges and freedom within the therapeutic milieu.

CP at 315.

¶21  Dr. Abbott also noted Sease had met with Dr. Leslie Sziebert, an SCC psychiatrist, before. Dr. Abbott did not detail when, or how many times, the two met. Dr. Abbott states that Sease appeared to have developed a therapeutic bond with Dr. Sziebert because Sease did not make negative comments about the doctor. Dr. Abbott also identified Sease's employment at the SCC as a form of treatment. Dr. Abbott concluded his discussion of treatment by listing several other forms of treatment Sease had at one time been involved in, but did not detail the level of Sease's participation in those programs. At the conclusion of his evaluation, Dr. Abbott diagnosed Sease as suffering from "Narcissistic Personality Traits," and that condition did "not

affect his emotional or volitional capacity predisposing him to engage in acts of sexual violence." CP at 313-14.

## ANALYSIS

A. STANDARD OF REVIEW

¶22  The SVP Act, chapter 71.09 RCW, presents two ways for trial courts to determine if probable cause exists for an evidentiary hearing: " '(1) by deficiency in the proof submitted by the State, or (2) by sufficiency of proof' by the detainee that he or she 'no longer suffers from a mental abnormality or personality disorder' or that any mental abnormality or personality disorder 'would not likely cause the prisoner to engage in predatory acts of sexual violence.' " *Meirhofer*, 182 Wn.2d at 643 (quoting *In re Det. of Petersen*, 145 Wn.2d 789, 798, 42 P.3d 952 (2002)); RCW 71.09.090(2)(c). Our review of a trial court's determination of probable cause is "limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). We review de novo the legal conclusions reached by the trial court. *Meirhofer*, 182 Wn.2d at 643.

B. STATUTORY FRAMEWORK

¶23  Under chapter 71.09 RCW, civil commitment is indefinite, "but the Department of Social and Health Services (DSHS) is required to have the condition of each person detained under the act reviewed by a qualified professional at least annually and regularly report to the court whether each detainee still meets the statutory and constitutional criteria for civil commitment." *Id.* at 637 (citing RCW 71.09.070(1); WAC 388-880-031). If the secretary of DSHS determines that the detainee no longer meets the requirements for civil commitment as an SVP, the secretary shall allow the detainee to petition the court for a full

release or a conditional release to a less restrictive alternative. *Id.*; RCW 71.09.090(1). Alternatively, a detainee may petition the trial court for a full or conditional release annually. *Meirhofer*, 182 Wn.2d at 637; RCW 71.09-.090(2)(a). When a detainee petitions for a full or conditional release, the trial court holds a show cause hearing to determine if sufficient evidence exists to warrant a full evidentiary hearing. *Meirhofer*, 182 Wn.2d at 637-38 (citing *State v. McCuistion*, 174 Wn.2d 369, 380, 275 P.3d 1092 (2012)); RCW 71.09.090(2)(a).

¶24 During the show cause hearing, the trial court "must assume the truth of the evidence presented," but "it may not 'weigh and measure asserted facts against potentially competing ones.'" *McCuistion*, 174 Wn.2d at 382 (quoting *Petersen*, 145 Wn.2d at 797). However, "[w]hile the court does not weigh the evidence, it is entitled to consider all of it." *Meirhofer*, 182 Wn.2d at 638 (citing *Petersen*, 145 Wn.2d at 798). The trial court "'must determine whether the asserted evidence, if believed, is *sufficient* to establish the proposition its proponent intends to prove.'" *Id.* (quoting *McCuistion*, 174 Wn.2d at 382).

¶25 As stated above, if the State presents "prima facie evidence that continued commitment is appropriate," or if the detainee presents "prima facie evidence that there is probable cause to believe his or her condition has 'so changed' that release is appropriate," then a full evidentiary hearing is warranted. *Id.* (citing *Petersen*, 145 Wn.2d at 798; RCW 71.09.090(2); *McCuistion*, 174 Wn.2d at 382). Probable cause exists to believe Sease's condition has "so changed" only if evidence exists "of a substantial change in [his] physical or mental condition such that [he] . . . no longer meets the definition of a sexually violent predator." RCW 71.09.090(4)(a).

¶26 Sease does not contend he has suffered a "physiological change" that renders him permanently "unable to commit a sexually violent act." RCW 71.09.090(4)(b)(i). Therefore, Sease can only show he is "so changed" if there is

"current evidence from a licensed professional" that there was a "change in [Sease's] mental condition brought about through positive response [sic] to continuing participation in treatment." RCW 71.09.090(4)(b)(ii). The policy concern here is "[t]o avoid disincentivizing treatment." *Meirhofer*, 182 Wn.2d at 639.

C. STATE'S PRIMA FACIE CASE

¶27 Sease contends that the State did not present prima facie evidence that he still met the definition of a sexually violent predator. In support, Sease argues that because he no longer is diagnosed with the antisocial and borderline personality disorders upon which he was initially committed, his condition has changed. We disagree.

¶28 The State presents prima facie evidence that continued commitment is warranted when "the committed person continues to meet the definition of a sexually violent predator." RCW 71.09.090(2)(c)(i). A " '[s]exually violent predator' means any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18).

¶29 The recently decided case of *Meirhofer*, 182 Wn.2d 632, controls. Meirhofer sought discretionary review of a trial judge's ruling that DSHS had met its prima facie showing, and that Meirhofer had failed to present sufficient prima facie evidence that he did not meet the definition of an SVP. *Id.* at 642. Meirhofer argued the State failed to present prima facie evidence because the State's expert did not diagnose him with pedophilia, for which he was committed, but instead diagnosed him with "both mental abnormalities and personality disorders, including paraphilia NOS (nonconsent) and personality disorder NOS with antisocial and borderline features." *Id.* at 643-44.

¶30 Our Supreme Court upheld the trial court's conclusion that the State had met its prima facie burden showing

Meirhofer was still defined as an SVP for two reasons. *Id.* at 642. First, the court noted it had previously affirmed commitments "based on paraphilia NOS nonconsent and antisocial personality disorder, which are essentially Meirhofer's remaining diagnoses." *Id.* at 644 (citing *In re Det. of Stout*, 159 Wn.2d 357, 363, 150 P.3d 86 (2007)). The State's showing that Meirhofer had "consistently suffered from paraphilia NOS nonconsent and a personality disorder" was "sufficient to show that Meirhofer 'suffers from a mental abnormality or personality disorder' . . . as required for continued commitment." *Id.* at 645 (quoting RCW 71.09-.020(18)). Second, the court adopted the analysis it had employed in *State v. Klein*, 156 Wn.2d 102, 120-21, 124 P.3d 644 (2005), which allowed for evolving diagnoses based on the same symptoms. *Meirhofer*, 182 Wn.2d at 644. The court in *Meirhofer* held, "While we cautioned that '[d]ue process requires that the nature of the commitment bear some reasonable relation to the purpose for which the individual is committed,' we found sufficient connection from the 'original diagnosis of psychoactive substance-induced organic mental disorder . . . and the current diagnosis of polysubstance dependence' to justify continued commitment." *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Klein*, 156 Wn.2d at 119-20). Our Supreme Court held that "the change from a diagnosis of pedophilia to a 'rule out pedophilia' . . . is not sufficient to require a new evidentiary proceeding." *Id.*

¶31 The *Meirhofer* court also held the State had met its prima facie showing that Meirhofer was likely to reoffend if not confined. *Id.* at 645. Using the Static-99R actuarial risk assessment test, Meirhofer was found to have about a 20 percent chance of recidivism after 5 years, and about a 30 percent chance of recidivism after 10 years. *Id.* at 640. The determination of whether someone is likely to reoffend is better based on both static and dynamic risk factors, as well as the expert's clinical judgment. *Id.* at 646. In *Meirhofer*, "the State's expert opined that 'there has been no apparent

change in [Meirhofer's] mental condition that would indicate a lowered risk for sexual re-offense.' " *Id.* (alteration in original). Because this opinion was supported by the record, our Supreme Court held the State had met its prima facie burden showing Meirhofer was likely to reoffend. *Id.*

■ ¶32 Applying the *Meirhofer* analysis to the case before us, we hold that the State has met its prima facie showing that Sease still fits the statutory definition of an SVP based on his current diagnoses because an evolving diagnosis based on the same symptoms does not mean his condition has changed. *Id.* at 643-46 (adopting *Klein*, 156 Wn.2d at 120-21). In *Klein*, the court said:

> The DSM-IV-TR [American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th rev. ed. 2000)] candidly acknowledges, for example, that each category of mental disorder is not a completely discrete entity. DSM-IV-TR at xxx. In other words, the subjective and evolving nature of psychology may lead to different diagnoses that are based on the very same symptoms, yet differ only in the name attached to it. Construing RCW 10.77.200 to mandate release based on mere semantics would lead to absurd results and risks to the patient and public beyond those intended by the legislature. We decline to substitute our judgment for that legislative determination.

156 Wn.2d at 120-21 (footnote omitted).

¶33 The diagnoses that formed the basis of Sease's commitment—borderline personality disorder; antisocial personality disorder; narcissistic personality disorder; and alcohol dependence—bear a "sufficient connection" to Dr. Newring's diagnoses of: narcissistic personality disorder with borderline, antisocial, sadistic and paranoid features; cognitive disorder NOS; rule-out paraphilia; cognitive disorder NOS; borderline intellectual functioning; and alcohol dependence in a controlled environment. *Meirhofer*, 182 Wn.2d at 644; *Sease*, 149 Wn. App. at 71. Although Sease's diagnoses may have changed, the underlying symptoms or mental conditions have remained consistent and not changed. For example, consider Sease's behavior in light of Dr. Saari's description of Antisocial Personality Disorder.

Dr. Saari described Antisocial Personality Disorder as involving a "failure to conform to social norms with respect to lawful behaviors." CP at 62. In Sease's 2005 civil commitment evaluation, Dr. Doren stated Sease presented with " 'serious difficulty in controlling his behavior.' " *Sease*, 149 Wn. App. at 71; *see also* CP at 27. And Dr. Newring most recently described Sease's "ability to function without substantial difficulties both in the community and within institutional settings" as being "severely impacted." CP at 257. Our Supreme Court acknowledges that the categorizing of mental disorders is "subjective and evolving," and therefore, "may lead to different diagnoses that are based on the very same symptoms." *Klein*, 156 Wn.2d at 120-21. That is the case here. Therefore, we hold that the State fulfilled its prima facie burden of showing Sease still met the definition of an SVP. *Id.* To hold otherwise would allow semantics to put patients and the public at a risk beyond that intended by the legislature. *Id.* at 121.

¶34 The State also met its prima facie showing that Sease was likely to reoffend if not confined. Here, as in *Meirhofer*, the Static-99R actuarial risk assessment test was applied to determine Sease's risk of recidivism. Sease's scores were nearly identical to Meirhofer's. Where Meirhofer had about a 20 percent chance of reoffending within 5 years, Sease had a 19.6 percent chance, and where Meirhofer had about a 30 percent chance of reoffending within 10 years, Sease had a 27.7 percent chance. *Meirhofer*, 182 Wn.2d at 640.

¶35 In addition, Dr. Newring conducted a dynamic risk assessment test, finding that Sease had "not shown a durable change in dynamic risk over the current review period," in large part because he was so resistant to treatment. CP at 258. Dr. Newring opined that Sease, "continues to present with a mental condition(s) [sic] that seriously impairs his ability to control his sexually violent behavior," and "Sease's condition has not so changed such that conditions can be imposed that would adequately protect the

community, and a less restrictive alternative would not, at the present time, be in his best interest." CP at 263; *Meirhofer*, 182 Wn.2d at 646 (holding no apparent change in mental condition indicating a lower risk for sexual re-offense when static tests are combined with dynamic risk factors and doctor's clinical judgment).

¶36 Thus, the State presented static and dynamic risk factor analyses that showed Sease was likely to reoffend and presented Dr. Newring's opinion that Sease could not be safely released. We hold the state met its prima facie burden to show Sease would likely reoffend if not confined to a secure facility.

D. SEASE'S PROBABLE CAUSE FOR "SO CHANGED"

¶37 Sease next contends he established probable cause that his condition has "so changed" that he no longer meets the criteria for an SVP. Br. of Pet'r at 6. In support, Sease points to the fact that his diagnosis has changed from what it was when he was committed, and to Dr. Abbott's report, which concludes that the change in Sease's diagnosis has come about as a result of Sease's participation in the "thera-peutic milieu" at the SCC. CP at 308. We hold Sease did not present probable cause to believe he had "so changed" be-cause the SVP statute and case law require the person's mental *condition* to change, not the person's *diagnosis*.

¶38 "We review issues of statutory interpretation de novo." *In re Det. of Boynton*, 152 Wn. App. 442, 451, 216 P.3d 1089 (2009). When interpreting a statute, we first look to the statute's plain meaning and assume the legislature meant what it says. *Id.* To ascertain the plain meaning, each provision of the statute must be read in relation to the other provisions so as to construe the statute as a whole. *Id.* at 452. Where the plain language of the statue is unam-biguous, our inquiry ends and the statute is given effect according to its plain meaning. *Id.*

¶39 The SVP statute states that "[p]robable causes ex-ists to believe that a person's *condition* has 'so changed' . . .

only when evidence exists . . . of a substantial change in the person's physical or mental *condition*." RCW 71.09-.090(4)(a) (emphasis added). The statute continues, "[A] trial proceeding may be held, only when there is current evidence . . . of one of the following and the evidence presents a change in *condition* since the person's last commitment trial proceeding: . . . (ii) [a] change in the person's mental *condition* brought about through positive response to continuing participation in treatment." RCW 71.09.090(4)(b) (emphasis added). Neither "diagnosis" nor "diagnoses" appears in RCW 71.09.090. Thus, based on the plain language of the statute, the trial court's decision at a show cause hearing hinges on whether the person's "condition" has so changed, not whether his or her "diagnosis" has changed.

¶40 *Meirhofer* supports this interpretation. In *Meirhofer*, the committed individual argued that his "change in diagnosis from pedophilia to hebephilia" was "significant" because he had been "found to be [an] SVP based on the diagnoses of pedophilia." 182 Wn.2d at 646. The Supreme Court rejected that argument, holding, "Any change in Meirhofer's *condition* was not driven by any 'positive response to continuing participation in treatment.'" *Id.* (emphasis added). "Instead, it appears to be driven by dispute within the psychiatric establishment and refinement in the relevant diagnostic criteria." *Id.*

¶41 Therefore, determining whether Sease established probable cause to believe his condition has "so changed," this court must look at the underlying symptoms that have formed the basis for his commitment. The symptoms Dr. Doren identified at Sease's commitment correlate closely with what the prior and subsequent reviewing doctors have continued to see.

¶42 Dr. Doren described the symptoms of antisocial personality disorder as involving a pattern of "'disregard for and violation of the rights of others.'" *Sease*, 149 Wn. App. at 71 n.6. Dr. Saari similarly described the behaviors to include the "failure to conform to social norms with

respect to lawful behaviors," "some degree of deceitfulness," "impulsivity," an "irritability and aggressiveness," and a "lack of remorse." CP at 62.

¶43 Dr. Doren described a person with a borderline personality disorder as having "a pattern of instability in any of four areas: emotions, thinking, interaction with other people, or ability to control impulses." *Sease*, 149 Wn. App. at 71 n.6. Likewise, Dr. Saari described the borderline personality disorder behaviors as including "some degree of abandonment sensitivity and abandonment fears," "recurrent suicidal behavior," "self-mutilat[ion]," an "affective instability," and "inappropriately intense anger." CP at 62.

¶44 Finally, Dr. Doren described the narcissistic personality disorder as a pattern of showing disdain for everybody else, where no one else is as good as they are—they are above others and feel they should be treated specially, while other people are essentially worthless. *Sease*, 149 Wn. App. at 71 n.6. Similarly, Dr. Saari described the behaviors as including a "grandiose sense of self-importance," a "strong sense of entitlement," being "interpersonally exploitative and manipulative," demonstrating a "lack of empathy," and a sense of arrogance. CP at 62.

¶45 The order of the terms by the doctors who evaluated Sease before he was committed varied slightly, but Dr. Doren's observations of Sease aligned with the observations of Drs. Foley, Goldenberg, Grosskopf, and Clark, who had all evaluated Sease during his time in the Department of Corrections. Similarly, all of the doctors who have evaluated Sease since his commitment, except for Dr. Abbott, have noted the same problematic conditions. Despite identifying the same problematic conditions, slight variance in diagnostic terms continued at each annual review. The recurring symptoms include Sease suffering from: a "severe dysfunction at the level of morality and prosocial values"; "manipulation of other people to suit his own wishes and ends"; "aggressive behavior and exploitation of other people"; "impulsive behavior in the community and while housed in

institutional settings"; a lack of "normal inhibitions toward harming other people to gratify his needs"; "tak[ing] pleasure in dominating other people"; "callousness and lack of empathy"; and "offense-analogue behaviors." *See, e.g.*, CP at 58, 65, 208. Thus, although there were varying forms of diagnostic labels given, all the evaluating doctors consistently recognized the same underlying conditions in Sease.

¶46 The only evidence Sease provided to show his condition had "so changed" was that his diagnoses had changed. Br. of Pet'r at 6. Dr. Abbott concluded that because he, and the doctors administering the annual reviews, had determined that Sease did not currently suffer from antisocial or borderline personality disorder, Sease's mental condition necessarily had to have changed. Dr. Abbott's conclusion erroneously equates a mental condition with a diagnosis. The plain meaning of RCW 71.09.090 and our Supreme Court's interpretation of that statute refute the conflation of those two terms. *Meirhofer*, 182 Wn.2d at 643-46. Instead, a person's mental condition can be described by one or more diagnoses, and those diagnoses can be subjective and evolving. RCW 71.09.090; *Meirhofer*, 182 Wn.2d at 646; *Klein*, 156 Wn.2d at 120-21. Therefore, because RCW 71.09.090(4)(a) requires Sease to show that "[p]robable cause exists to believe that [his] condition has 'so changed,'" and Sease failed to show his *condition* changed, the trial court properly dismissed Sease's petition.

¶47 Because Dr. Abbott's conclusions are not sufficiently supported by the evidence, Sease did not establish probable cause exists to believe his condition has "so changed" that he no longer meets the definition of an SVP as a result of a positive response to any continuing participation in treatment.

¶48 We affirm.

BJORGEN, A.C.J., and SUTTON, J., concur.

Review granted at 184 Wn.2d 1019 (2015).

Review dismissed by order of the Supreme Court February 12, 2016.