# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of:<br><br>JEFFREY PAYNE,<br><br>               Petitioner. | No.  49025-1-II<br><br><br><br>UNPUBLISHED OPINION |

MELNICK, J. — We granted Jeffrey Payne's motion for discretionary review from the trial court's finding that he continues to meet the statutory definition of a sexually violent predator (SVP) and must remain committed to the care and custody of the Department of Social and Health Services.

We conclude that, to the extent the State had to prove that Payne's mental abnormality and personality disorder caused him "serious difficulty" controlling his behavior, it has done so. Additionally, the State presented prima facie evidence that Payne will "more probably than not" engage in predatory acts of sexual violence if not confined to a secure facility.[1]  We affirm.

---

[1] Payne also asks us to waive appellate costs.  Pursuant to RAP 14.2, we will defer to a commissioner if the State files a cost bill and Payne objects.

## FACTS

I.    ACTS OF SEXUAL ASSAULT

Payne's first sex offense conviction occurred in 1995 in British Columbia. His girlfriend's nine-year-old daughter, AK, had had her nine-year-old friend, DL, sleep over at her home while Payne stayed there. Payne called DL into the living room, pulled her toward him on the couch, reached under her shirt, and fondled her breast. She told him "don't" but he continued and told her not to tell her mother because "she will blow it all out of proportion." Clerk's Papers (CP) at 43-44. AK also reported that Payne had fondled her breast and her vagina. Payne denied any sexual contact with DL or AK. He claimed he had just hugged both girls.

British Columbia charged Payne with two counts of sexual assault, one against AK and another against DL. AK recanted her testimony about the assault at trial and a judge convicted Payne of the assault against DL. Payne subsequently violated the conditions of his release by not keeping away from the victims' families. He pled guilty to two counts of breach of undertaking.[2] The judge sentenced him to confinement and sex offender treatment.

In 1997, AK's friend MM stayed over with AK. After AK had fallen asleep, Payne joined MM on her bed and slipped his fingers between the bottoms of her pajamas. He also rubbed her stomach. Payne had previously told MM that she would "owe him a sexual favor" for allowing AK to sleep over at MM's home. CP at 45. The subsequent police investigation indicated that Payne had, on numerous occasions, molested AK and her younger sister, BH. He also molested SJ and TT, BH's friends.

---

[2] Failure to comply with release conditions. *See* Canada Criminal Code § 145(3).

British Columbia charged Payne with four counts of sexual assault: one against each of SJ, MM, TT, and BH. It also charged him with one count of breach of probation. Released pending trial, he tried to contact his girlfriend by telephone at least four times in violation of the terms of his release. Payne pled guilty to sexual assault of BH and received a sentence of one year in jail on March 16, 1999. Canada deported him for his sexual offenses.

In early September 2000, Payne committed his first known sexual offense in the United States in Kitsap County. He offered to babysit for a woman with whom he smoked marijuana. Payne molested her eight-year-old daughter while the daughter slept. When she awoke, he gave her five dollars to not tell anyone. Payne admitted to reaching into the eight-year-old's pants and fondling her vaginal area.

Later, he assisted the same woman in moving to live with her sister. The sister saw Payne pin her four-year-old daughter against the corner of the room. She also saw Payne "pulling back the lips of her vagina cavity." CP at 48. Payne denied molesting the four-year-old, claiming that she had injured herself jumping on a screwdriver.

Kitsap County charged Payne with two counts of child molestation in the first degree. A jury found him guilty of molesting the eight-year-old and not guilty of molesting the four-year-old. He was resentenced in June 7, 2004 to 113 months in prison.

II.     SEXUALLY VIOLENT PREDATOR COMMITMENT

On January 11, 2013, Payne stipulated to his civil commitment as an SVP. *See* RCW 71.09.020(18). He was admitted to the Special Commitment Center (SCC) for control, care, and treatment. The stipulation provided that the State would not oppose Payne's release to a less restrictive alternative (LRA) if he actively engaged in sex offender treatment for two consecutive years at the SCC.

III.     2015 ANNUAL REVIEW FINDINGS

On January 29, 2016, Dr. Kristin Carlson completed her required annual review of Payne's SVP status.  *See* RCW 71.09.070.   In preparing her report, she reviewed historical records, including previous evaluations, consulted SCC staff, and interviewed Payne.

Carlson assessed Payne using both the Static-99R, an actuarial measure of risk for recidivism, and dynamic risk factors, factors linked with repeat sexual offending.  Under the Static-99R, she gave Payne a score of 5.  Offenders with this score are estimated to sexually reoffend 21.2 percent of the time within five years and 32.1 percent of the time within ten years.

Carlson evaluated the following dynamic risk factors: (1) deviant sexual interests; (2) cooperation with supervision; (3) lack of concern for others; (4) problem solving deficits; (5) significant social influences; (6) hostility toward women; (7) negative emotionality/hostility; (8) sexual pre-occupations/sex-drive; and (9) sexualized coping.  She discussed what each of these factors meant and how facts from Payne's case affected each factor.  She did not make express findings about the applicability of any specific factor, instead cautioning that the fact "[t]hat these risk factors have been identified for Mr. Payne does not imply that each risk factor is currently present."  CP at 29.  She acknowledged that her list included both historical and current dynamic risk factors for Payne.  Carlson based her discussion of these factors on Payne's self-report, clinical inferences made about Payne's self-report, and information from his clinical records.  Carlson also identified three protective factors that are linked with a decrease in risk of recidivism, but did not find that any of them applied to Payne.  She noted that he had not "progressed successfully in treatment to mitigate his risk for re-offense."  CP at 32.

4

Specifically related to the "deviant sexual interests" factor, Carlson noted that Payne denied having recent fantasies of children, but "reported experiencing a 'twinge' when having thoughts of a 'young girl.'" CP at 29. She also stated that he "has a history of denying sexual arousal to children, and continuing to sexually reoffend." CP at 29. She found he "claimed to have made improvements" to his hostility toward women, but had "recently violated the boundaries of a female staff member" and "continued to attempt to interact with the woman despite being told not to interact with her." CP at 30. Payne also "appeared to be perseverating" on the incident and "reported having lost approximately 12 pounds as a result of stress related to this incident." CP at 31.

Carlson observed that Payne had a "history of having difficulty following the law and conditions of his release" and that he was currently having "difficulties understanding aspects of treatment and difficulty cooperating fully with treatment recommendations." CP at 29. Carlson also noted that Payne had a long history of showing lack of concern for others, a lack of positive social relationships, and historical use of sex as coping.

Carlson concluded that Payne met the diagnostic criteria for four DSM-5 mental disorders: (1) pedophilic disorder, sexually attracted to females, nonexclusive type; (2) other specified paraphilic disorder, nonconsent; (3) cannabis use disorder, in a controlled environment; (4) antisocial personality disorder with narcissistic traits. She opined that his pedophilic disorder qualified as a "mental abnormality" under RCW 71.09.020(8), and his antisocial personality disorder with narcissistic traits as a "personality disorder" under RCW 71.09.020(9). CP at 32. She found that his dynamic risk factors "intermingle with aspects of Mr. Payne's diagnoses, leading Mr. Payne to be at an elevated risk of sexual offending if he were not confined." CP at 32. She also concluded that, in her professional opinion, "Mr. Payne currently meets the definition of

a sexually violent predator." CP at 34 (emphasis omitted). She declared that Payne "suffers from a mental abnormality and personality disorder which make him likely to engage in predatory acts of sexual violence if not confined in a secure facility" and that "there is no indication that his mental or physical condition has changed substantially during the course of this review period." CP at 34.

On March 4, 2016, because Payne did not waive his right to a hearing, the State moved for a show cause hearing. *See* RCW 71.09.090(2)(a). As a basis for Payne's continued commitment, the State relied exclusively on Carlson's annual review. Payne responded to the State's motion on April 27, arguing that the annual review had failed to provide prima facie evidence that Payne continued to meet the criteria for SVP status.

The Kitsap County Superior Court heard arguments and, based on Carlson's annual review, held that Payne should continue to be held as an SVP. It found that the State had provided prima facie evidence that Payne continued to meet the definition of an SVP. It also found that conditional release to an LRA would not be in Payne's best interest and that conditions could not be imposed that would adequately protect the community. Further, it concluded that Payne had not demonstrated probable cause for a new trial.

We granted Payne's motion for discretionary review.

ANALYSIS

I.    LEGAL PRINCIPLES

A.    INITIAL COMMITMENT

"It is well settled that civil commitment is a significant deprivation of liberty, and thus individuals facing SVP commitment are entitled to due process of law. *In re Det. of Morgan*, 180 Wn.2d 312, 320, 330 P.3d 774 (2014). "The 'process due' to a person subject to an SVP petition

6

is the procedure allocated by 'the statute which authorizes civil incarceration.'" *In re Det. of Strand*, 167 Wn.2d 180, 187, 217 P.3d 1159 (2009) (quoting *In re Det. of Martin*, 163 Wn.2d 501, 511, 182 P.3d 951 (2008)). Individuals facing SVP commitment have the right to a trial, to an expert to conduct an evaluation on his or her behalf, and to the assistance of appointed counsel. RCW 71.09.050.

In *Morgan*, the Court commented on the legislature's "'honest recognition of the difficulties inherent in treating those afflicted with the mental abnormalities causing the sex predator condition.'" *Morgan*, 180 Wn.2d at 319 (quoting *In re. Pers. Restraint of Young*, 122 Wn.2d 1, 31, 857 P.2d 989 (1993)). Yet the court reasoned that the "legislature found that 'the exceptional risks posed by sexual predators, and the seemingly intractable nature of their illness, necessitates a specially tailored civil commitment approach.'" *Morgan*, 180 Wn.2d at 319 (quoting *Young*, 122 Wn.2d at 10). The court emphasized that "SVP proceedings focus not on 'the criminal culpability of . . . past actions,' but on 'treating [SVPs] for a current mental abnormality, and protecting society from the sexually violent acts associated with that abnormality.'" *Morgan*, 180 Wn.2d at 319-20 (quoting *Young*, 122 Wn.2d at 21).

An SVP is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). "Sexually violent offense" is defined to include "child molestation in the first or second degree." RCW 71.09.020(17). "Mental abnormality" means "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." RCW 71.09.020(8). "Personality disorder" is defined as "an enduring

pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has onset in adolescence or early adulthood, is stable over time and leads to distress or impairment." RCW 71.09.020(9). Finally, "[l]ikely to engage in predatory acts of sexual violence if not confined in a secure facility" means "the person more probably than not will engage in such acts if released unconditionally from detention on the sexually violent predator petition." RCW 71.09.020(7).

B.    ANNUAL REVIEW

Once a person has been committed as an SVP, the State is required to conduct annual reviews to determine whether the individual continues to meet the definition of an SVP. RCW 71.09.070. A person found to be an SVP has two statutory ways to obtain release. RCW 71.09.090. The State may authorize a detainee to file a petition for either unconditional release or transfer to an LRA if the detainee has "so changed" that he either no longer meets the definition of an SVP or that an LRA is in the individual's best interest. RCW 71.09.090(1). Alternatively, an SVP may petition for unconditional release or transfer to an LRA without the agreement of the State if he has "so changed" that he no longer fits the SVP definition or that an LRA is in his best interest. RCW 71.09.090(2)(a).

If the detainee does not waive his right to petition for release, the trial court holds a show cause hearing to determine whether an evidentiary hearing shall be held. RCW 71.09.090(2)(a). At the show cause hearing, the State bears the burden of establishing by prima facie evidence that (1) the individual continues to meet the definition of an SVP and (2) that transfer to an LRA is not in the best interest of the detainee and conditions cannot be imposed that would protect society. RCW 71.09.090(2)(b). If the State fails to meet its burden, the trial court must hold an evidentiary hearing. RCW 71.09.090(2)(c)(i). If the State meets its burden, the SVP can still obtain an

8

evidentiary hearing if probable cause exists to believe the detainee is no longer an SVP or that an LRA is in the detainee's best interest and the public can be adequately protected. RCW 71.09.090(2)(c)(ii).

"The standard of proof at the show cause hearing is 'probable cause.'" *State v. McCuistion*, 174 Wn.2d 369, 382, 275 P.3d 1092 (2012) (quoting *In re Det. of Petersen*, 145 Wn.2d 789, 796, 42 P.3d 952 (2002)). Under this standard, "a court must assume the truth of the evidence presented; it may not 'weigh and measure asserted facts against potentially competing ones.'" *McCuistion*, 174 Wn.2d at 382 (quoting *Petersen*, 145 Wn.2d at 797). The court "can and must determine whether the asserted evidence, if believed, is *sufficient* to establish the proposition its proponent intends to prove." *McCuistion*, 174 Wn.2d at 382. The court may find that there is probable cause for an evidentiary hearing either "'(1) by deficiency in the proof submitted by the State, or (2) by sufficiency of proof by the detainee that he or she no longer suffers from a mental abnormality or personality disorder or that any mental abnormality or personality disorder would not likely cause the prisoner to engage in predatory acts of sexual violence.'" *In re Det. of Sease*, 190 Wn. App. 29, 41, 357 P.3d 1088 (2015) (quoting *In re Pers. Restraint of Meirhofer*, 182 Wn.2d 632, 643, 343 P.3d 731 (2015)). In this case, Payne himself has not submitted any evidence and argues only the deficiency of that provided by the State.

C.     STANDARD OF REVIEW

We review "whether evidence meets the probable cause standard" de novo. *Petersen*, 145 Wn.2d at 799. *Petersen* held that trial court "determinations of probable cause that are based on the credibility and reliability of confidential informants or anonymous tips, i.e., 'historical facts,'" should be "afforded appropriate discretion on review," but that the court should review de novo "whether the qualifying information as a whole amounts to probable cause." 145 Wn.2d at 800.

The Supreme Court reaffirmed in *McCuistion* that a "trial court's determination as to whether evidence establishes probable cause is subject to de novo review." 174 Wn.2d at 382.

II.     SERIOUS DIFFICULTY CONTROLLING BEHAVIOR

Payne argues that, at the show cause hearing, the State is required to present prima facie evidence that his mental abnormality or disorder subjects him to "serious difficulty" controlling his behavior. He asserts that Carlson's annual review failed to demonstrate a connection between his mental abnormality or personality disorder and any "serious difficulty" controlling his behavior.

The State contends that "'serious difficulty controlling behavior' is not an element the State must prove either at commitment or as part of the annual review process." Br. of Resp't at 15.

*In re Detention of Thorell*, 149 Wn.2d 724, 72 P.3d 708 (2003), addressed this issue in the context of an initial SVP commitment. Analyzing *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002), it held that "a determination that a potential SVP has serious difficulty controlling dangerous, sexually predatory behavior" is required for an SVP commitment, but that this requirement "does not require a *separate* finding." *Thorell*, 149 Wn.2d at 735. To "distinguish[] the SVP from the dangerous but typical criminal recidivist," the State must link his "serious difficulty in controlling behavior to a mental abnormality, which together with a history of sexually predatory behavior, gives rise to a finding of future dangerousness." *Thorell*, 149 Wn.2d at 736.

In *In re Detention of Stout*, the court reaffirmed the above rule from *Thorell*. 159 Wn.2d 357, 380, 150 P.3d 86 (2007). It stated:

> If the fact finder is not required to make a separate finding about a potential SVP's ability to control his or her behavior, it stands to reason that the fact finder would not be required to make a legal conclusion about it either—particularly where difficulty controlling behavior is *not* an *element* the State must show.

*Stout* 159 Wn.2d at 380.

Payne has not cited to any statute or case that requires this determination at an annual review show cause hearing. At these annual hearings, the State is required to show prima facie evidence that (1) "the committed person continues to meet the definition of a sexually violent predator"[3] and (2) that release to an LRA would either not be in the best interest of the person or that conditions at an LRA could not adequately protect the community. RCW 71.09.090(2)(c); *In re Det. of Belcher*, 189 Wn.2d 280, 288-89, 399 P.3d 1179 (2017).

If the State was required to present prima facie evidence that Payne has "serious difficulty" controlling his behavior, it did so through Carlson's report. Carlson observed that dynamic risk factors "intermingle with aspects of Mr. Payne's diagnoses, leading Mr. Payne to be at an elevated risk of sexual offending if he were not confined." CP at 32. She based her conclusions on her findings that Payne met the diagnostic criteria for pedophilic disorder and his antisocial personality disorder, finding that both of these diagnoses "make [Payne] likely to engage in predatory acts of sexual violence." CP at 32, 34. Although Carlson did not explicitly declare that Payne's mental abnormality and personality disorder caused him "serious difficulty" controlling his behavior, a

---

[3] An SVP must "suffer[] from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). No "serious difficulty controlling behavior" is required.

"separate finding" of serious difficulty is not required, even at initial commitment. *Thorell*, 149 Wn.2d at 735.

If the State must present prima facie evidence that a committed SVP has "serious difficulty" controlling behavior at an annual review show cause hearing, it has done so here.

III.    PAYNE WOULD MORE PROBABLY THAN NOT REOFFEND IF RELEASED

Payne argues that the State was required to provide prima facie evidence that Payne "more probably than not" will engage in predatory acts of sexual violence if released. Br. of Appellant at 9. He alleges that Carlson's findings regarding Payne's likelihood to engage in predatory acts of sexual violence were "conclusory statements that were only partially supported by facts" and that she did not "provide evidence justifying her conclusion." Br. of Appellant at 11-12. Payne compares Carlson's conclusions to those of "police officers in the field," arguing that she must present the underlying bases for her conclusions so the court may determine whether they amount to probable cause for itself. Br. of Appellant at 10-11.

Payne further contends that Carlson's use of the Static-99R test estimated Payne's risk of sexual reconviction "at approximately 32% over ten years," indicating that Payne is not more likely than not to engage in predatory acts of sexual violence. He also distinguishes Carlson's findings that Payne's dynamic risk factors put him at an "elevated risk" of sexual offending from a finding that he "more probably than not" will reoffend. Br. of Appellant at 13.

At an annual review hearing, the State must show that a committed SVP "continues to meet the definition of a sexually violent predator." RCW 71.09.090(2)(b). The definition of "sexually violent predator" includes the requirement that the person be "likely to engage in predator acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). "Likely to engage in predatory acts of sexual violence if not confined in a secure facility" is further defined by statute

as: "more probably than not will engage in such acts if released unconditionally from detention." RCW 71.09.020(7).

*In re Detention of Brooks* interpreted the "more probably than not" language of the statute to mean "more than 50 percent." 145 Wn.2d 275, 295, 36 P.3d 1034 (2001) *overruled on other grounds by Thorell*, 149 Wn.2d 724. The Court later specified that whether that standard is satisfied "depends on the facts underlying the SVP petition and the expert testimony. It also may depend on the statistical likelihood of reoffending." *In re Det. of Moore*, 167 Wn.2d 113, 125, 216 P.3d 1015 (2009) (footnote omitted).

To assess future dangerousness, courts generally approve of "two broad approaches to conducting risk assessments: clinical judgment or actuarial assessment." *Thorell*, 149 Wn.2d at 753. The clinical approach "requires evaluators to consider a wide range of risk factors and then form an overall opinion concerning future dangerousness." *Thorell*, 149 Wn.2d at 753. The actuarial approach "evaluates a limited set of predictors and then combines these variables using a predetermined, numerical weighting system to determine future risk of reoffense which may be adjusted (or not) by expert evaluators considering potentially important factors not included in the actuarial measure." *Thorell*, 149 Wn.2d at 753. *Belcher* reaffirmed that the use of actuarial instruments satisfies "due process so long as they have appropriate safeguards," despite the uncertainty of their predictions. 189 Wn.2d at 295. "As with all expert testimony, the use of an actuarial instrument is subject to the rigors of the Rules of Evidence." *Belcher*, 189 Wn.2d at 295.

In *Meirhofer*, the court further clarified the "more than 50 percent" requirement in the context of an annual review show cause hearing. 182 Wn.2d at 636. Although actuarial instruments suggested Meirhofer's risk of reoffense was "30 percent in the next 10 years," the court held that "the SVP act does not limit experts to the results of actuarial tests and there is no

13

requirement that 'the SVP will reoffend in the foreseeable future.'" *Meirhofer*, 182 Wn.2d at 645 (quoting *Moore*, 167 Wn.2d at 125). Because the expert had opined, "[b]ased on static and dynamic risk factors and his own clinical judgment," that "there has been no apparent change in [Meirhofer's] mental condition that would indicate a lowered risk for sexual re-offense," the court concluded that the State had met its prima facie burden that he was "likely" to reoffend. *Meirhofer*, 182 Wn.2d at 645-46.

In *Sease*, we further solidified that an actuarial requirement below 50 percent can meet the "likely" to reoffend requirement of the statute. 190 Wn. App. at 46. In that case, the Static-99R actuarial risk assessed Sease to have a 19.6 percent likelihood to reoffend within five years and 27.7 percent within ten years. *Sease*, 190 Wn. App. at 46. The expert opined that Sease "continue[d] to present with a mental condition(s) [sic] that seriously impair[ed] his ability to control his sexually violent behavior." *Sease*, 190 Wn. App. at 46. These findings were sufficient for the State to meet its prima facie burden to demonstrate that Sease continued to meet the statutory definition of an SVP. *Sease*, 190 Wn. App. at 47.

The expert in this case applied both risk assessments that the court approved of in *Thorell*: an actuarial assessment using the Static-99R and her own clinical judgment. Similarly to the expert in *Meirhofer*, her actuarial assessment predicted a recidivism rate of about 32.1 percent in 10 years. She also opined that the "dynamic risk factors intermingle with aspects of Mr. Payne's diagnoses, leading Mr. Payne to be at an elevated risk of sexual offending if he were not confined." CP at 32. She based her conclusion on facts in the record, including Payne's reported "'twinge' when having thoughts of a 'young girl,'" his difficulty cooperating with treatment recommendations, and his violating the boundaries of a female staff member. CP at 29. Carlson provided in-depth analysis

into each of nine dynamic risk factors and also noted that Payne "has not at this time[] progressed successfully in treatment to mitigate his risk for re-offense." CP at 32.

Because Carlson's assessment of Payne's dynamic risk factors and diagnoses placed him at an "elevated risk," and her conclusions are supported by her annual review, we conclude that Payne is at least as likely to reoffend as was the SVP in *Meirhofer* where the expert testified to "no apparent change" in the SVP's mental condition. 182 Wn.2d at 646. Therefore, we further conclude that the State presented prima facie evidence that Payne is likely to commit acts of predatory sexual violence if released.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for the public record in accordance with RCW 2.06.40, it is so ordered.

Melnick, J.

We concur:

Johanson, J.

Maxa, A.C.J.