# Illinois Official Reports

## Appellate Court

*In re Detention of Lieberman*, 2017 IL App (1st) 160962

| | |
|---|---|
| Appellate Court Caption | *In re* DETENTION OF BRAD LIEBERMAN (The People of the State of Illinois, Petitioner-Appellee, v. Brad Lieberman, Respondent-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-0962 |
| Filed | June 1, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-80001; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kimball R. Anderson and Anthony D. Pesce, of Winston & Strawn LLP, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick and John R. Schleppenbach, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Gordon and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    Respondent Brad Lieberman appeals from the trial court's order denying his petition for discharge and granting the State's motion for a finding that no probable cause existed to discharge him from commitment pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2012)). On appeal, respondent argues that the Cook County circuit court erred in ruling that no probable cause existed that he should be discharged because his current diagnosis of "Sexual Sadism" differed from the diagnosis for which he was originally adjudicated a sexually violent person under the Act, namely "Paraphilia, Not otherwise specified" (PNOS). He contends that the State cannot "unilaterally change the mental disorder that forms the basis of an individual's commitment," and that such a change in diagnosis violates his due process rights and is barred by *res judicata*. Respondent also contends that the trial court erred in failing to impose sanctions against the State for its "untimely disclosure" of respondent's annual reevaluation report.

¶ 2    As we have noted in a previous appeal, respondent's criminal history and subsequent commitment under the Act are well documented. The supreme court summarized respondent's history in the consolidated decision, *In re Detention of Stanbridge*, 2012 IL 112337, ¶¶ 19-22, as follows:

> "In 1980, Lieberman was convicted of numerous counts of rape and sentenced to multiple concurrent terms of imprisonment. Shortly before his scheduled release date from prison in 2000, the State sought to have Lieberman involuntarily committed as a sexually violent person pursuant to the Act (725 ILCS 207/1 *et seq.* (West 2000)).
>
> In February 2006, a jury found Lieberman to be a sexually violent person within the meaning of the Act. The mental disorders that formed the basis for Lieberman's commitment included paraphilia, not otherwise specified, sexually attracted to nonconsenting persons (paraphilia NOS-nonconsent). The State's experts described this type of disorder as one premised on intense recurring rape behaviors with nonconsenting adults that cause distress or impair one's ability to function in society. Thereafter, in April 2006, the trial court ordered Lieberman committed to the Department for institutional care and treatment in a secure facility until further order of the court.
>
> Lieberman appealed, arguing, *inter alia*, that the State failed to prove that he suffers from a serious lack of volitional control resulting from a current mental disorder, and failed to prove beyond a reasonable doubt that he suffers from a mental disorder or that he presents any risk to reoffend. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 597-98 (2007). Specifically, he maintained that the State's expert's opinions and diagnoses did not meet the diagnostic criteria of the Diagnostic and Statistical Manual of Mental Disorders (DSM). *Id.* at 602. His commitment was affirmed on direct appeal. *Id.* at 611."

¶ 3    Following his initial commitment and the supreme court's affirmance of that commitment, respondent has been periodically reviewed under section 55(a) of the Act, which requires a report six months after the initial commitment and a yearly report thereafter "for the purpose of determining whether *** the person has made sufficient progress in treatment to be conditionally released." 725 ILCS 207/55(a) (West 2012). Following respondent's challenges to these reports, this court has repeatedly affirmed the trial court's findings that no probable

cause existed to conclude that he was no longer a sexually violent person under the Act. See *In re Detention of Lieberman*, 2015 IL App (1st) 141360-U; *In re Detention of Lieberman*, 1-09-2162 (2011) (unpublished order under Supreme Court Rule 23).

¶ 4    The proceedings at issue in this appeal began on March 19, 2014, when the State filed the 2013 reexamination report and a motion for a finding of no probable cause. Respondent objected to the filing, arguing that the Act required the State to file the report within 12 months of the prior reexamination. The trial court, however, overruled the objection and found the filing timely because it immediately followed the same-day resolution of the same motions related to the 2011 and 2012 reexaminations.

¶ 5    The 2013 reexamination report, dated October 18, 2013, was completed by Dr. Kimberly Weitl. It indicated that Dr. Weitl reviewed respondent's previous evaluations, court records, disciplinary records, and the Illinois Department of Human Services (DHS) treatment plan. Dr. Weitl attempted to interview respondent for the reexamination, but respondent refused.

¶ 6    Dr. Weitl reviewed respondent's criminal history and noted that respondent had been accused of raping 17 women in Cook and Lake Counties over a 10-month period in 1979 and 1980, including during a period when he was on bond for earlier offenses. She observed that respondent's crimes shared common features—specifically, he

"frequently used weapons during the commission of his sexual assaults, heightening the fear in the victims. Many times he forced his way into the women's homes or raped them as they were walking in the neighborhood. He was frequently noted to have threatened to kill the victims if they reported the assaults. He typically grabbed the women around the throat, while forcing them to undress. All of the women were strangers."

¶ 7    Dr. Weitl also noted that respondent had a history of disciplinary issues in prison, including "engaging in sexual intercourse with a female visitor in the visiting room restroom," making phone contact with one of the women who had accused him of sexually assaulting her, and continuing to correspond with a woman after he was ordered not to do so.

¶ 8    Based on the above, Dr. Weitl found that respondent met the "DSM-5/DSM-IV/TR diagnoses" of sexual sadism and antisocial personality disorder. Dr. Weitl explained that sexual sadism "is a paraphilic disorder that involves inflicting physical or psychological pain and suffering on a non-consenting person during a sexual act." Dr. Weitl noted that respondent was "formerly diagnosed with Paraphilia Not Otherwise Specified, Non-Consent, but using the newly released fifth edition of the DSM it is clear that he meets the diagnosis for Sexual Sadism." She indicated that the new DSM-5 "explicitly note[s] that this diagnosis is intended to apply to both individuals who freely admit to having such sexual interests [involving the infliction of physical or psychological pain and suffering on a non-consenting person during a sexual act] and to those who deny such interest despite evidence to the contrary." She further stated that sexual sadism was "considered a mental disorder under the act."

¶ 9    As to antisocial personality disorder, Dr. Weitl stated that the

"essential feature of antisocial personality disorder is a pervasive pattern of disregard for, and violation of, the rights of others since the age of 15. Mr. Lieberman has demonstrated a failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest. He has a history of physical violence on others, indicating he suffers from irritability and aggressiveness.

- 3 -

He has demonstrated a reckless disregard for safety of himself and others, indicated by his criminal history of physical and sexual assault and stealing. He has shown a lack of remorse, indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another. *** Although this disorder, by itself, would not ordinarily qualify as a mental disorder under the Act, it has a synergistic effect in combination with his other disorders, and increases Mr. Lieberman's predisposition to acts of sexual violence. In this case, antisocial personality disorder *is* a mental disorder under the Act." (Emphasis in original.)

¶ 10    Dr. Weitl then evaluated the risk that respondent would reoffend, using three actuarial instruments—the Static-99, the revised Static-99, and the Minnesota Sex Offender Screening Tool-Revised. Respondent scored in the "high risk" or "highest risk" categories for each instrument. Dr. Weitl found additional factors increased respondent's risk of reoffending, including his antisocial lifestyle, lack of treatment motivation, and his belief that he did not pose a risk to reoffend. Dr. Weitl also considered various protective factors that could lower the risk of reoffense, including sex offender treatment or a medical condition, but found that they did not apply to respondent because he had not participated in treatment and had no identified medical condition that would decrease his risk of sexually reoffending.

¶ 11    In the report, Dr. Weitl concluded that respondent "suffers from one or more mental disorders, which are congenital or acquired conditions, affecting his emotional or volitional capacity and predisposing him to engage in acts of sexual violence," and that "[a]s a result of [respondent's] mental disorder(s), it is substantially probable that (he) will engage in acts of sexual violence." Dr. Weitl stated that respondent's "condition has not changed since his last examination" and that he had "not made sufficient progress in treatment to be conditionally released." She recommended that he "should continue to be found a Sexually Violent Person" under the Act and that he "should remain committed to the Illinois Department of Human Services-Treatment and Detention Facility for further secure care and sexual offense specific treatment."

¶ 12    On July 9, 2014, respondent filed a petition for discharge. Respondent maintained that he was entitled to discharge because he was no longer diagnosed with PNOS, the mental disorder on which his commitment was based, and because the sexual sadism diagnosis was "improper and unreliable." Respondent also argued that commitment based on sexual sadism violated his due process rights because that mental disorder was not found by a jury beyond a reasonable doubt. Respondent further contended that the State's motion for a finding of no probable cause and Dr. Weitl's 2013 report "should be stricken as untimely pursuant to 725 ILCS 5/2-619(5)."

¶ 13    The State responded, asserting that it was respondent's burden to show that he was no longer sexually violent and his criticisms of his new diagnosis did not meet that burden. The State also contended that respondent's due process rights were not violated and that due process does not require a "new trial or discharge every time an expert opines that a respondent remains sexually violent under a different diagnosis that perhaps did not exist at the time of trial, that was not wholly supported by the version of DSM in effect at that time, or some combination thereof." The State also pointed out that section 2-619 applied only to actions and pleadings and clarified that it had received the report in October 2013 while the 2011 and 2012 reports and accompanying motions were still pending in the trial court and, "[r]ather than queue up yet another report and motion, the People determined that the most efficient way to

proceed was to first resolve the 2011 and 2012 motions before proceeding with the 2013 report."

¶ 14 On November 14, 2014, the trial court held a hearing on the State's motion for a finding of no probable cause and respondent's petition for discharge. After hearing arguments from the parties, the trial court expressed some concern regarding the significance of the new diagnosis and ordered discovery and another hearing on that issue.

¶ 15 Respondent deposed Dr. Weitl on April 16, 2015. During the deposition, Dr. Weitl testified that she is a licensed clinical psychologist and that she evaluated respondent in 2010, 2011, 2012, and 2013. Dr. Weitl visited the treatment and detention facility on October 5, 2013, where she requested to speak with respondent, and he refused. Dr. Weitl completed the report on October 18, 2013. She diagnosed respondent with sexual sadism and antisocial personality disorder and recommended that he continue to be confined as a sexually violent person. Dr. Weitl acknowledged that she had previously diagnosed respondent with PNOS under the DSM IV-TR. She testified that nothing in respondent's condition or behavior had changed since the most recent prior reexamination and, aside from the version of the DSM, the documents she used in making her diagnoses were the same. Dr. Weitl further acknowledged that the diagnostic criteria for sexual sadism had not substantially changed from the DSM IV-TR to the DSM-5.

¶ 16 What had changed, however, was an addition to the DSM-5 sexual sadism "Diagnostic Features," which instructed that "[t]he diagnostic criteria for sexual sadism disorder are intended to apply both to individuals who freely admit to having such paraphilic interests and to those that deny any sexual interest in the physical or psychological suffering of another individual despite substantial objective evidence to the contrary." Dr. Weitl explained that prior to this addition, she was not able to diagnose respondent with sexual sadism under the DSM IV-TR because the diagnostic criteria required her to know respondent's motive for engaging in the violent behavior, specifically that the victim's suffering was "sexually exciting" to respondent. Respondent, however, denied such arousal. She explained that self-reporting was required to determine motive because, "for instance, if he was choking the victim just to get control over her to have non-consenting sex, that wouldn't necessarily be arousing to him." However, once the DSM-5 was released and explicitly directed that the disorder could be diagnosed where the person denied such interest "despite substantial objective evidence to the contrary," Dr. Weitl believed that sexual sadism "better describe[d]" respondent's behavior and mental disorder. Dr. Weitl acknowledged that some doctors felt comfortable diagnosing sexual sadism under prior versions of the DSM without self-reporting; however, other doctors, including Dr. Weitl, did not.

¶ 17 When asked whether PNOS and sexual sadism were different mental disorders, Dr. Weitl explained that "a yes or no question" was not appropriate. She testified that she was "telling the truth" when she had previously diagnosed him with PNOS, but based on the new version of the DSM, she concluded that respondent "still has a Paraphilia" but his paraphilia was no longer "Not Otherwise Specified" and instead was now "specified by Sexual Sadism." When questioned about whether respondent no longer has PNOS, or whether he could still be diagnosed with PNOS, Dr. Weitl testified that PNOS could "still describe his behavior" and that "he is still attracted to non-consenting victims." Dr. Weitl testified that she "would not say that he doesn't" have PNOS, but she believed that the sexual sadism diagnosis better described his behavior based on the instructions of the new DSM.

¶ 18     Dr. Weitl further testified that paraphilic disorders, including PNOS and Sexual Sadism, are "chronic, lifelong disorders" that do not go away but can be managed with treatment. Respondent, however, had refused to participate in any such treatment.

¶ 19     On December 14, 2015, respondent filed a supplemental petition for discharge. He maintained that he should be released from DHS custody because his commitment was based on him having PNOS. Respondent contended that the PNOS diagnosis was no longer supported and that a change in diagnosis was not allowed under the Act. Respondent argued that *res judicata* barred the State from arguing that he suffered from sexual sadism and that no probable cause existed to believe that he suffered from sexual sadism. Respondent also contended that the State should be sanctioned for failing to timely submit Dr. Weitl's reexamination report.

¶ 20     In support of his supplemental petition, respondent attached a statement from Dr. Michael B. First, a professor of clinical psychiatry at Columbia University. Dr. First stated that PNOS and sexual sadism were "mutually exclusive categories" and that the "diagnostic definition of Sexual Sadistic Disorder in the DSM-5 is virtually unchanged from the definition in the DSM-IV." Dr. First believed that the prior versions of the DSM did not require an individual to self-report sexual arousal to be diagnosed with sexual sadism and stated that evaluators had been making "paraphilia diagnoses based on the individual's sexual behavior in the absence of self-reported arousal" for "at least the past 10-15 years." Dr. First concluded that "the diagnosis of Sexual Sadism was available to Dr. Weitl at the time of her 2010, 2011, and 2012 evaluations" of respondent. Dr. First did not express any opinion as to whether respondent suffered from PNOS, sexual sadism, or any other mental disorder. He did not evaluate respondent's progress in treatment or whether it was substantially probable that he would sexually reoffend.

¶ 21     The State responded, reiterating that it was respondent's burden to show that he no longer had a mental disorder or was no longer substantially probable to engage in acts of sexual violence and that Dr. First's statement was irrelevant to that issue.

¶ 22     On February 29, 2016, the trial court held a hearing on the State's motion for a finding of no probable cause and respondent's motion for discharge. After hearing argument from both parties, the trial court stated that

> "the issue is, it's the burden of the defense to show that the respondent here is no longer sexually violent, circumstances have changed such that he is no longer a sexually violent person or that he's no longer dangerous.
>
> And the fact is that all the testimony before this Court is that the condition that he had is—doesn't go away with time, that in the 20 years or 15 years, 16 years he's been in the Department, he's not had a lick of treatment and that there's nothing to indicate that he's no longer sexually dangerous, quite simply.
>
> I don't think the defendant's met his burden to show that there is anything that's changed. So your motion for a finding of no probable cause is *** granted, and your motion for discharge is denied."

¶ 23     When asked by respondent for a specific ruling on his request for sanctions, the court stated that it was "denied. I don't see any prejudice." The trial court also rejected respondent's *res judicata* argument, noting that the issues were different in different proceedings and that "the science of psychiatry changes over the years."

¶ 24        Thereafter, the trial court entered a written order finding that there was no probable cause to warrant an evidentiary hearing to determine whether respondent was still a sexually violent person. The trial court denied respondent's July 9, 2014, petition for discharge and December 14, 2015, supplemental petition for discharge. This appeal followed.

¶ 25        In this court, respondent contends the trial court erred in finding no probable cause to warrant his discharge because his current diagnosis of sexual sadism differed from his original PNOS diagnosis. Respondent contends that the State cannot "unilaterally change the mental disorder that forms the basis of an individual's commitment" and that such a change in diagnosis violates his due process rights and is barred by *res judicata*. Respondent also argues that the trial court erred in failing to impose sanctions against the State for its "untimely disclosure" of respondent's annual reevaluation report.

¶ 26        The Act allows for the involuntary commitment of "sexually violent persons" by the DHS for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2012). As relevant here, a "sexually violent person" is defined under the Act as "a person who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2012).

¶ 27        After a person has been committed under the Act, the State must submit a written report based on an evaluation of the individual's mental condition "at least once every 12 months after an initial commitment." 725 ILCS 207/55(a) (West 2012). The primary purpose of the written report is to determine whether "(1) the person has made sufficient progress in treatment to be conditionally released and (2) whether the person's condition has so changed since the most recent periodic reexamination *** that he or she is no longer a sexually violent person." *Id.*

¶ 28        At the time of the annual examination by the State, the committed person receives notice of the right to petition the court for discharge. 725 ILCS 207/65(b)(1) (West 2012). If the committed person does not affirmatively waive that right, the court must set a probable cause hearing to determine whether facts exist that warrant a hearing on whether the respondent remains a sexually violent person. *Id.* "However, if a person has previously filed a petition for discharge without the Secretary's approval and the court determined, either upon review of the petition or following a hearing, that the person's petition was frivolous or that the person was still a sexually violent person, then the court shall deny any subsequent petition under this Section without a hearing unless the petition contains facts upon which a court could reasonably find that the condition of the person had so changed that a hearing was warranted." *Id.*

¶ 29        For a respondent to receive an evidentiary hearing under section 65(b)(2) of the Act, the court must find a plausible account exists that the respondent is no longer a sexually violent person. 725 ILCS 207/65(b)(2) (West 2012). In a discharge proceeding, this means that the committed individual must present sufficient evidence that he no longer meets the following elements for commitment: (1) he no longer has "a mental disorder" or (2) he is no longer dangerous to others because his mental disorder no longer creates a substantial probability that he will engage in acts of sexual violence. 725 ILCS 207/5(f) (West 2012); *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 68. The trial court must "determine whether the movant has established ' "a *plausible account* on each of the required elements to assure the court that

- 7 -

there is a substantial basis for the petition." ' " (Emphasis in original.) *Stanbridge*, 2012 IL 112337, ¶ 62 (quoting *In re Detention of Hardin*, 238 Ill. 2d 33, 48 (2010), quoting *State v. Watson*, 595 N.W.2d 403, 420 (Wis. 1999)). Respondent carries the burden of proof under either standard, and this court reviews the ultimate question of whether respondent established probable cause *de novo*. *In re Detention of Lieberman*, 2011 IL App (1st) 090796, ¶ 40.

¶ 30        Respondent first argues that the trial court erred in finding no probable cause to warrant his discharge because his current diagnosis of sexual sadism differs from his original PNOS diagnosis. He contends that the fact that he is no longer diagnosed with PNOS is a change in circumstances that requires his release and that the State cannot "unilaterally change the mental disorder that forms the basis of an individual's commitment."

¶ 31        Initially, we question respondent's underlying premise that his former diagnosis of PNOS is not still a valid diagnosis in this case. Dr. Weitl never disavowed respondent's prior PNOS diagnosis and repeatedly testified that she could not say that respondent does not have PNOS. She never testified that respondent no longer suffers from PNOS or that the PNOS diagnosis was incorrect. Dr. Weitl opined, however, that the new version of the DSM allowed for a sexual sadism diagnosis where an individual denied having a sexual interest involving the infliction of physical or psychological pain and suffering on a nonconsenting person during a sexual act, despite evidence to the contrary. Dr. Weitl testified that this change in the DSM allowed her to diagnose respondent with sexual sadism, a mental disorder that better described his behavior.

¶ 32        Nevertheless, even if there was a "change" in respondent's diagnosis, based on our review of the record, we conclude that respondent did not put forth plausible evidence that such a change was "a change in the circumstances" that led to the previous finding that respondent had "a mental disorder that makes it substantially probable that he will reoffend." *Stanbridge*, 2012 IL 112337, ¶ 72.

¶ 33        In her deposition, Dr. Weitl also provided a thorough explanation for the change in respondent's diagnosis, namely that the new version of the DSM explicitly allowed such diagnosis in the absence of self-reported arousal, whereas prior versions of the DSM had not. She further testified that nothing in respondent's condition or behavior had changed since the most recent prior reexamination and that the change in diagnosis was merely a function of the new instructions in the DSM-5.

¶ 34        Although respondent put forth evidence that, in Dr. First's opinion, a sexual sadism diagnosis was previously available to Dr. Weitl, the fact that experts could disagree about whether a particular diagnosis applies to a committed individual does not necessarily create a change in circumstances undermining respondent's prior sexually violent person adjudication. Neither Dr. First nor any other expert testified that respondent did not suffer from a mental disorder or that he was not substantially likely to reoffend.

¶ 35        Moreover, the jury that originally adjudicated respondent a sexually violent person was asked to determine whether respondent suffered from a mental disorder. They were not asked specifically whether he suffered from PNOS or any other particular mental disorder. There was evidence in that proceeding that respondent suffered from both PNOS and antisocial personality disorder and that both qualified as mental disorders under the Act. We note that Dr. Weitl also diagnosed respondent with antisocial personality disorder during his 2013 reexamination, specifically citing his "failure to conform to social norms with respect to lawful behaviors, *** history of physical violence on others, *** reckless disregard for safety of

himself and others, [and] lack of remorse." Dr. Weitl specifically found, in respondent's case, that antisocial personality disorder predisposed him to acts of sexual violence and qualified as a mental disorder under the Act. Although she stated that this disorder, by itself, would not ordinarily qualify under the Act, she believed that the "synergistic effect in combination with his other disorders" predisposed him to acts of sexual violence. In these circumstances, even if we were to find his change in diagnosis from PNOS to sexual sadism problematic, defendant's antisocial personality disorder diagnosis could support his continued commitment.

¶ 36    We find *Stanbridge*, 2012 IL 112337, helpful to our analysis of this issue. In *Stanbridge*, the supreme court considered the consolidated appeals from postcommittment discharge proceedings for respondent Lieberman and Kevin Stanbridge, another individual committed under the Act, and addressed the quantum and scope of evidence needed to establish probable cause in a postcommitment discharge or conditional release proceeding pursuant to the Act. It determined that the movant—the committed individual in discharge or conditional release proceedings—bears the burden of establishing " ' "a plausible account on each of the required elements to assure the court that there is a substantial basis for the petition." ' " (Emphasis omitted.) *Id.* ¶ 62 (quoting *Hardin*, 238 Ill. 2d at 48, quoting *Watson*, 595 N.W.2d at 420). Specifically, respondent must provide "a plausible account that 'the committed person is no longer a sexually violent person' " (emphasis omitted) (*id.* ¶ 67 (quoting 725 ILCS 207/65(b)(2) (West 2008))), *i.e.*, that "(1) he no longer 'has a mental disorder'; or (2) he is no longer 'dangerous to others because the person's mental disorder [*no longer*] creates a substantial probability that he *** will engage in acts of sexual violence' " (emphasis omitted and in original) (*id.* ¶ 68 (quoting 725 ILCS 207/5(f), 15 (West 2008))).

¶ 37    With those standards in mind, the supreme court turned to the question of whether respondent Lieberman had met his burden to establish a plausible account that he was no longer a sexually violent person. After considering the testimony of Dr. Schmidt, respondent's expert who opined that PNOS was not a valid mental disorder, the supreme court determined that such testimony was not relevant to the postcommitment discharge proceeding. Specifically, there was "nothing in Dr. Schmidt's testimony that, if believed, would support a plausible account that Lieberman had made sufficient progress to show that he was substantially unlikely to reoffend if released into the community." *Id.* ¶ 82. Accordingly, the supreme court found that respondent's petition for conditional discharge was properly denied.

¶ 38    Similarly, in this case, respondent's objection to the change in his diagnosis is not relevant to the ultimate question of whether he continues to be a sexually violent person. As stated, respondent has not put forth anything that would tend to establish a plausible account that he no longer suffers from a mental disorder or that he is no longer substantially probable to engage in acts of sexual violence. It is respondent's burden, not the State's, to provide "a plausible account" that he " 'is no longer a sexually violent person' " in postcommitment proceedings. (Emphasis omitted.) *Id.* ¶ 67 (quoting 725 ILCS 207/65(b)(2) (West 2008)).

¶ 39    Respondent, however, relies on particular language used in *Stanbridge* to support his claim that he must be released because Dr. Weitl no longer diagnosed him with PNOS, the mental disorder for which he was originally adjudicated a sexually violent person. Specifically, respondent quotes *Stanbridge* to say that "the proper issue before the court applying the statute should be whether there was a plausible account of changed circumstances such that he *no longer* has the mental disorder for which he was already adjudicated in 2006." (Emphasis in original.) *Id.* ¶ 79. Respondent reads this passage to direct that if the specific mental disorder

for which he was adjudicated no longer applies, he can no longer be committed under the Act. Respondent, however, reads the passage out of context. *Stanbridge* did not consider the issue of whether a change in diagnosis established a plausible account of changed circumstances under the Act. At issue in *Stanbridge* was whether respondent's evidence attacking his diagnosis based on an "acknowledged 20-year-long debate in the medical community [as to the validity of a PNOS diagnosis]" was not evidence of changed circumstances since his commitment. *Id.* ¶ 79.

¶ 40 This court has previously found no probable cause existed to warrant an evidentiary hearing where the nomenclature of a committed individual's diagnosis was changed from PNOS to "other specified paraphilic disorder." This court determined that the change reflected "a relabeling or clarification of the elements of essentially the same disorder." *In re Detention of Hayes*, 2015 IL App (1st) 142424, ¶ 23.

¶ 41 We are not aware of any Illinois court that has considered the significance of a change in diagnosis, other than the above change in mere nomenclature. However, we find *In re Detention of Sease*, 357 P.3d 1088, 1094 (Wash. Ct. App. 2015), relating to a similar reexamination provision under Washington's Sexually Violent Predator Act, helpful to our analysis of the case at bar. In *Sease*, the Washington Appellate Court considered a committed individual's argument that "because he no longer [wa]s diagnosed with the antisocial and borderline personality disorders, upon which he was initially committed, his condition ha[d] changed" such that " 'release [wa]s appropriate.' " *Id.* at 1095-96.

¶ 42 The Washington Appellate Court found that Sease's original diagnoses bore a " 'sufficient connection' " to his new diagnoses, including "narcissistic personality disorder with borderline, antisocial, sadistic and paranoid features," and that, "[a]lthough Sease's diagnoses may have changed, the underlying symptoms or mental conditions have remained consistent and not changed." *Id.* at 1097. It continued:

> "an evolving diagnosis based on the same symptoms does not mean his condition has changed. [Citation.] ***
>
> '*** Construing [the provision] to mandate release based on mere semantics would lead to absurd results and risks to the patient and public beyond those intended by the legislature. We decline to substitute our judgment for that legislative determination.' [Citation.] ***
>
> *** [W]e hold that the State fulfilled its prima facie burden of showing Sease still met the definition of a SVP. [Citation.] To hold otherwise, would allow semantics to put patients and the public at a risk beyond that intended by the legislature. [Citation.]" *Id.* at 1097.

¶ 43 The Washington Appellate Court also concluded that "Sease did not present probable cause to believe he had 'so changed' because the SVP statute and case law require the person's mental *condition* to change, not the person's *diagnosis*." (Emphasis in original.) *Id.* at 1098; see also *In re Meirhofer*, 343 P.3d 731 (Wash. Ct. App. 2015) ("Any change in Meirhofer's condition was not driven by any 'positive response to continuing participation in treatment' as Meirhofer has refused to participate in treatment. Instead, it appears to be driven by dispute within the psychiatric establishment and refinement in the relevant diagnostic criteria.").

¶ 44 Similarly in this case, respondent's diagnosis has changed based on an update to the DSM, which, according to Dr. Weitl, allowed respondent's mental condition to be better described by

a sexual sadism diagnosis. However, his "underlying symptoms or mental conditions have remained consistent and not changed." *Sease*, 357 P.3d at 1097. Dr. Weitl testified that nothing in respondent's condition had changed since the most recent prior reexamination and, aside from the version of the DSM, the documents she used in making her diagnoses were the same.

¶ 45    We also observe that the record shows that respondent has continually refused to engage in the treatment suggested by his mental health providers and, as in this case, he repeatedly has refused to participate in his reexaminations. Without a thorough analysis of his present condition, respondent will be unable to show that he is no longer a sexually violent person. In these circumstances, we conclude that respondent has not met his burden of establishing a plausible account that he is no longer a sexually violent person.

¶ 46    Respondent also contends that his continued commitment violates his due process rights because it "is no longer supported by or consistent with the jury verdict." Due process permits an individual to be held as long as he or she is both mentally ill and dangerous, but not longer. *Stanbridge*, 2012 IL 112337, ¶ 85 (citing *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992)). It is well established that all statutes carry a strong presumption of constitutionality (*People v. Maness*, 191 Ill. 2d 478, 483 (2000)) and that the party challenging a statute bears the burden of clearly establishing the constitutional infirmity (*People v. Jeffries*, 164 Ill. 2d 104, 111 (1995)).

¶ 47    As noted above, in respondent's adjudication trial, the jury found that respondent suffered from a mental disorder. It did not find that respondent suffered from PNOS or any other specific mental disorder. As such, we reject respondent's contention that the proceedings at issue here are somehow inconsistent with the prior jury verdict. Dr. Weitl testified that respondent continues to have a mental disorder and he continues to be dangerous. There is nothing inconsistent in that testimony from the jury's verdict, and respondent presented no evidence conflicting with Dr. Weitl's testimony on those issues. All evidence before the trial court indicated that respondent continues to suffer from a mental disorder and that he would be substantially probable to reoffend if released. Accordingly, we find no merit to respondent's constitutional contentions. *Stanbridge*, 2012 IL 112337, ¶ 85 (citing *Foucha*, 504 U.S. at 77).

¶ 48    We also reject respondent's contention that a change to his diagnosis is barred by *res judicata*. Respondent asserts that the diagnosis of sexual sadism was available to the State at the time of the original commitment proceedings and, because it failed to allege that he had that diagnosis at that time, it is procedurally barred from changing his diagnosis in the reexamination proceedings. Respondent further contends that the Act does not "allow for changing the diagnosis of an individual after he or she has already been committed" and that a shift in diagnosis "is simply not contemplated by the statute."

¶ 49    We disagree with respondent's premise. The explicit purpose of the reexamination statute is to determine whether a committed individual's "condition has so changed since the most recent periodic reexamination *** that he or she is no longer a sexually violent person." 725 ILCS 207/55(a) (West 2012). The supreme court in *Stanbridge* stated that such change could include "a change in the professional knowledge and methods used to evaluate a person's mental disorder or risk of reoffending." *Stanbridge*, 2012 IL 112337, ¶ 72. Although, as we have found here, not every change in diagnosis will constitute a change in circumstances undermining a committed person's status as a sexually violent person, it is clear that the Act contemplates the possibility of a change in a committed person's diagnosis. Indeed, it would be absurd to read the statute in a way to conclude that the Act does not allow a change in a

committed person's diagnosis, thereby dissuading the State from gaining a better understanding of that person's condition.

¶ 50    Having said that, we conclude that *res judicata* does not apply to the circumstances of this case. *Res judicata* is "designed to prevent the multiplicity of lawsuits between the same parties and involving the same facts and the same issues." *Murneigh v. Gainer*, 177 Ill. 2d 287, 299 (1997). " 'The doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action.' " *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008) (quoting *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 334 (1996)). "Three requirements must be satisfied for *res judicata* to apply: (1) a final judgment on the merits has been rendered by a court of competent jurisdiction; (2) an identity of cause of action exists; and (3) the parties or their privies are identical in both actions." *Id.* (citing *Downing v. Chicago Transit Authority*, 162 Ill. 2d 70, 73-74 (1994)).

¶ 51    *Res judicata* extends only to the facts and conditions as they were at the time a judgment was rendered. *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 46. "When new facts or conditions intervene before a second action, establishing a new basis for the claims and defenses of the parties respectfully, the issues are no longer the same, and the former judgment cannot be pleaded as a bar in a subsequent action." (Internal quotation marks omitted.) *Id.*

¶ 52    *Res judicata* does not apply here, because the facts and issues are not the same in this proceeding as they were at the time of respondent's initial commitment. At issue in respondent's 2006 trial was whether he was a sexually violent person at the time of the trial. At issue in the 2013 reexamination proceeding is whether respondent *continued to be* a sexually violent person *in 2013*.

¶ 53    Finally, respondent contends that the trial court erred in failing to impose sanctions against the State for its "untimely disclosure" of respondent's annual reevaluation report. The parties disagree as to the standard of review on this issue. Generally, the trial court's denial of sanctions is subject to an abuse of discretion standard. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16. Respondent, however, maintains that this court should utilize a *de novo* standard of review, because "the Circuit Court ruled on the request as a matter of law without an evidentiary hearing." Citing *Mohica v. Cvejin*, 2013 IL App (1st) 111695, ¶ 50, the State contends that *de novo* review is inappropriate where, "as here, 'the conduct at issue occurred before the judge issuing [or denying] the sanctions, who, therefore, [was] in the best position to determine whether the conduct warranted penal sanctions.' " We need not determine which standard of review is appropriate because we would reach the same conclusion under either analysis.

¶ 54    Respondent contends that the State should be sanctioned and he should be "immediately released" because the State violated the provision in the Act that requires an annual examination report. This court has rejected this argument in *In re Detention of King*, 2016 IL App (1st) 150041, ¶¶ 21-22, which held that the provision requiring a reexamination report was directory, not mandatory. This court specifically stated:

>    "Section 55 provides that the Department 'shall submit a written report to the court on his or her mental condition at least once every 12 months.' This is directory. The Act has no negative language prohibiting further action in the event the State does not comply. Further, the right to annual reexamination as a method for obtaining discharge

is not injured by a filing delay because the Act provides alternative methods to petition for discharge. A petitioner may seek other remedies, including a show-cause order or a *mandamus* action under section 14-101 of the Code of Civil Procedure (735 ILCS 5/14-101 *et seq.* (West 2014)), compelling the Department to file the report. Thus, King was not entitled to immediate release and the trial court correctly dismissed his petition." *Id.* ¶ 22.

As a result, we find no merit to respondent's contention in this court that the State's delay requires his "immediate release."

¶ 55     Respondent also relies on *Brady v. Maryland*, 373 U.S. 83 (1963), in support of his sanctions request. He specifically contends that the State prevented him from using the reexamination report in the proceedings related to his 2011 and 2012 reexamination proceedings and the "proper sanction for the State's conduct is disposition [*sic*] of the State's case and [respondent's] immediate release."

¶ 56     In *Brady*, the United States Supreme Court held that the "State has a constitutional obligation to disclose evidence that is both favorable to the accused and 'material either to guilt or to punishment.' " *People v. Burt*, 205 Ill. 2d 28, 46-47 (2001) (quoting *Brady*, 373 U.S. at 87). "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 47 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

¶ 57     To prove that he was denied due process of law under *Brady*, defendant must show that (1) the evidence is favorable because it is exculpatory or impeaching, (2) the evidence was suppressed by the State either wilfully or inadvertently, and (3) the accused was prejudiced because the evidence was material to guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008).

¶ 58     Initially, we note that respondent has not provided any authority supporting his implicit contention that *Brady* applies in the civil Act context. Nonetheless, even assuming its applicability here and assuming that the State's delay in turning over the reexamination report could be considered a willful or inadvertent "suppress[ion]" of that document, respondent cannot establish a *Brady* violation.

¶ 59     As discussed above, Dr. Weitl's reexamination report was not favorable to respondent. It concluded that respondent continued to suffer from a mental disorder and that he remained substantially probable to reoffend. The change in diagnosis in this case was not exculpatory or impeaching because it did not establish a change in circumstances relevant to his prior adjudication as a sexually violent person. Accordingly, we also reject respondent's contention that he suffered prejudice in the form of "months of additional and unnecessary involuntary confinement." Even if the report had been available earlier, it would have had no effect on the outcome of the 2011 and 2012 proceedings.

¶ 60     Finally, respondent cites a number of Illinois Rules of Professional Conduct in requesting sanctions, specifically Rules 3.3, 3.4 and 3.8 (Ill. R. Prof'l Conduct (2010) R. 3.3 (eff. Jan. 1, 2010); R. 3.4 (eff. Jan. 1, 2010); R. 3.8 (eff. Jan. 1, 2016)). However, it is the supreme court and the Attorney Registration and Disciplinary Commission that have "the exclusive authority to discipline or sanction the unprofessional conduct of attorneys admitted to practice before it." *Beale v. Edgemark Financial Corp.*, 297 Ill. App. 3d 999, 1010 (1998) (citing *People ex rel. Brazen v. Finley*, 119 Ill. 2d 485 (1988), and *In re Mitan*, 119 Ill. 2d 229 (1987)). A party cannot seek redress in the trial court for the mere misconduct of an attorney. *Id.*; see also

*Freeman v. Myers*, 191 Ill. App. 3d 223 (1989) (attorney cannot be sanctioned by the trial court for violating the Code of Professional Responsibility; Attorney Registration and Disciplinary Commission, as arm of Illinois Supreme Court, is the forum for which the latter charges are to be heard and discipline imposed).

¶ 61    Although it has been recognized that an "[a]rgument can be made *** that a trial court may consider attorney violations of the Illinois Rules of Professional Conduct if that misconduct results in prejudice or adversely impacts the rights of the parties in the case pending before it" (*Beale*, 297 Ill. App. 3d at 1010), this court has already determined that respondent suffered no prejudice from the State's late filing. Therefore, even if the State's late filing violated any of the Rules of Professional Conduct cited by respondent, which we do not find, sanctions in the trial court would be inappropriate. *Id.* at 1011.

¶ 62    In conclusion, respondent has failed to establish a plausible account that he is no longer a sexually violent person. Accordingly, we uphold the trial court's decision to grant the state's motion for a finding of no probable cause to warrant an evidentiary hearing and to deny respondent's petition for discharge.

¶ 63    For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 64    Affirmed.